## ORIGINAL

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

HOME QUARTERS REAL ESTATE GROUP, LLC,

Plaintiff,

v.

MICHIGAN   DATA   EXCHANGE,   INC.   d/b/a/
MIREALSOURCE, and REALCOMP II, LTD.,

Defendants.

_____/

*Exhibits A-B*

**07 - 1 2 0 9 0**

Case No. _____

Hon. _____ **NANCY G. EDMUNDS**

**MAGISTRATE JUDGE SCHEER**

Michael T. Raymond (P 43254)
Jonathan S. Groat (P58547)
Dickinson Wright PLLC
301 E. Liberty, Suite 500
Ann Arbor, MI 48104-2266
Phone: (734) 623-1629

_____/

**FILED**

## <u>COMPLAINT AND DEMAND FOR TRIAL BY JURY</u>

Plaintiff Home Quarters Real Estate Group, LLC (hereinafter "HQ"), by and through its

attorneys, Dickinson Wright PLLC, for its Complaint and Demand for Trial by Jury ("Complaint")

against Defendants Michigan Data Exchange, Inc. d/b/a/ MiRealSource (hereinafter

"MiRealSource") and Realcomp II, Ltd. ("Realcomp") states as follows:

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Home Quarters Real Estate Group, LLC ("HQ") seeks damages as a result of

Defendants' prior unlawful actions and efforts to prevent HQ from providing to the public an

efficient and cost-effective way to buy and sell real estate in the Detroit metropolitan area.  HQ

previously operated as a licensed real estate brokerage engaged in the practice of assisting

consumers with the purchase and/or sale of residential properties. HQ provided services as an innovative realty company that developed faster and more efficient ways to provide realty services to prospective homebuyers and sellers utilizing modern internet technology. HQ provided its customers with the same realty services and same information provided by other realtors in the State of Michigan. However, HQ did so using a different and more efficient way of doing business that passed the resulting cost savings on to its customers.

Defendants are professional trade associations that provide multiple listing services ("MLS") for residential properties in the Detroit metropolitan area. Defendants are comprised of individual real estate brokers competing with each other. Defendants' respective memberships overlap in substantial part, such that a significant number of individual competing real estate brokers are members of both Defendants. Participation in each of these MLSs, and access to MLS data provided by them, has been crucial at all relevant times for any realtor, including HQ, to be able to effectively compete in the Southeastern Michigan residential real estate market (Wayne, Oakland, Macomb, Washtenaw, and Livingston Counties).

Defendants previously terminated and/or threatened to terminate HQ's right to access their MLS data as part of their efforts to destroy HQ's innovative business model and to thwart competition. Moreover, in furtherance of Defendants' boycotts denying HQ essential MLS data for conducting searches for listed properties, MiRealSource refused to permit any of HQ's listings to be posted on its MLS, and Realcomp threatened to terminate HQ's access to its MLS. These actions, among others, resulted in the cessation of HQ's business and thereby caused substantial damages to HQ, including but not limited to lost market share, lost revenues and lost profits.

## Jurisdiction And Venue

1.     This Court has jurisdiction over this action under 28 U.S.C. §1331, 28 U.S.C. §1337, and 28 U.S.C. §1367.

2.     Defendants are representative trade associations of competing real estate brokers and other real estate professionals. Defendants have engaged, individually and in combination by virtue of, among other things, significant overlapping constituent membership, in an unlawful restraint of interstate trade and commerce in the offering of real estate brokerage services. The activities of Defendants, individually and in concert, are within the flow of interstate commerce and their activities have a substantial effect upon that commerce.

3.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b).

## Parties

4.     Plaintiff HQ is a Michigan limited liability company.

5.     Defendant MiRealSource is a professional trade association located in Clinton Township, Macomb County, Michigan, that, on information and belief, provides a multiple listing service ("MLS") for residential properties in Michigan and in the greater Detroit metropolitan area. More specifically, MiRealSource was previously and is still engaged in the practice of operating an Internet-based service used by participating realtors to share and exchange data regarding real estate listings. On information and belief, the MiRealSource database previously contained more than 300,000 listings. In addition, and on information and belief, approximately 8,000 real estate brokers/agents (representing more than 740 offices), including the members of MiRealSource's Board of Directors, compete in the provisioning of real estate services, and use the MiRealSource database.

3

6. Defendant Realcomp is Michigan's largest realtor-owned MLS provider of residential real property information. Realcomp's principal place of business is located at 28555 Orchard Lake Road, Farmington Hills, Oakland County, Michigan. Realcomp is, on information and belief, wholly-owned by and serves the members of the Dearborn Area Board of Realtors, the Detroit Board of Realtors, the Livingston County Association of Realtors, Metropolitan Consolidated Association of Realtors, the North Oakland County Board of Realtors, and the Western Wayne-Oakland County Association of Realtors. On information and belief, Realcomp serves over 14,500 realtor brokers and agents, including the members of Realcomp's Board of Governors and Realcomp's various constituent realtor boards, who compete in the provision of real estate services. On further information and belief, Realcomp has the largest MLS database in the State of Michigan, and serves nearly half of all realtors in the State of Michigan.

## Multiple Listing Services and the Traditional Real Estate Office

7. A Multiple Listing Service (hereinafter "MLS") is a cooperative venture used by real estate brokers from various real estate firms to list their properties and exchange data regarding properties for sale. Realtors participating in an MLS provide property listings to the MLS and, in turn, are able to search the MLS listings (hereinafter "MLS Compilation Data") provided by other realtors for properties with characteristics and feature (e.g., price, addresses, etc.) desired by their clients. On information and belief, every real estate broker and agent in Southeastern Michigan is a member of and/or subscriber to at least one MLS.

8. The widespread use of MLSs by real estate brokers and agents reflects the crucial competitive importance of the central benefit of MLS participation: the opportunity to market to the participants' customers and clients the listings of other MLS participants, and

4

likewise, to have other MLS participants attempt to procure a ready, willing and able buyer for the participants' own listings. The form in which the MLS information is provided to the buying client varies among agents. Generally the agent copies the appropriate MLS listings and hands/faxes/e-mails the MLS information to the buying client for his review. If a customer desires to inspect any of the properties located by the realtor through the MLS, the realtor facilitates such inspections and, ultimately, the purchase of any such property.

### HQ's Innovative Business Model

9. HQ's business model, which has since been put out of business by the unlawful actions of Defendants detailed herein, incorporated new Internet technology with traditional real estate practice. Prospective buyers were invited to visit HQ's website and engage HQ as their realtor. If the prospective homebuyer chose to engage HQ as his/her realtor, he/she did so by entering into an agreement with HQ whereby he or she became HQ's client (hereinafter "buying client") and agreed to HQ's Terms of Use. In addition, to become an HQ buying client via the HQ website, a consumer was required to provide HQ with an e-mail address, which HQ would verify as legitimate and operational. The buying client was then allowed to access HQ's private, password protected website to search a restricted range of MLS-listed homes based upon client-specified criteria.

10. When a buying client desired to physically tour a listed property or properties, he or she would contact an HQ agent via email or telephone to arrange a showing between the client (and/or cooperative realtor or agent, if applicable) and one of HQ's sales agents. In order to arrange the showing, the HQ agent was required to access MLS Compilation Data to obtain detailed information concerning the requested property and to obtain contact

5

information to make an appointment for a showing. Next, the HQ agent would meet the prospective buying client at the property, show the property to the buying client, and assist in the purchase of the property.

11. Like traditional realtors, HQ provided its customers with MLS information for properties meeting their buying criteria. Rather than printing the MLS information or providing it via email, HQ's innovative business model delivered the same information through its more convenient and efficient private, password-protected website directly to the customer.

12. The HQ business model was uniquely consumer-focused. HQ's innovative business model met the demands of consumers who wanted to search for a new home from the comfort of their homes or offices. HQ's innovative format gave its customers the flexibility to conduct their own searches of MLS Compilation Data at their leisure and allowed HQ to alert its customers of updated MLS listings as soon as they become available.

13. HQ also assisted other clients wishing to sell their properties (hereinafter "selling clients") by, among other things, listing such properties on MLS systems so that the selling clients' properties had exposure to potential buyers.

14. Because of the efficiencies of HQ's business model, it was able to pass significant savings along to its clients by charging lower commissions than more traditional realtors. For example, HQ offered a cash rebate of up to one percent (1%) of the sale price to those buyers who used HQ's services to purchase their home. For sellers, HQ typically offered to list a seller's property for a four and one-half percent (4.5%) commission, which is one and one-half (1.5%) to two and one-half (2.5%) less than the typical commission rate of six percent (6%) to seven percent (7%) of the sales price of the home.

6

15.     Traditional realtors, like the realtors who control and make up Defendants' constituent and overlapping memberships, were threatened by HQ's business because it jeopardized their profits and their traditional way of doing business. As a result, and as detailed herein, Defendants acted to unreasonably restrain trade and, ultimately, put HQ out of business.

16.     As a result of Defendants' unlawful actions in restraining competition and putting HQ out of business, HQ has suffered damages in excess of $10,000,000.

### Defendants' Unlawful Actions in Restraint of Trade

17.     Defendants are representative trade associations of competing real estate brokers and other real estate professionals that agreed to policies and rules that impeded and unreasonably restrained competition. Defendants' individual membership is comprised of real estate brokers in direct competition with each other. On information and belief, at all times relevant to this Complaint, Defendants had significant overlapping constituent membership such that a substantial number of competing real estate brokers and other professionals were members of both Defendants. By virtue of their overlapping membership and market power, Defendants assumed the power to exclude other competitors from access to necessary business resources. In addition, and on information and belief, Defendants' board members and related operational control groups were similarly competing real estate brokers or related competitive entities that, through their use and control of Defendants, had effective control over the resources and practices used to exclude HQ from the market. As such, Defendants served as mere instrumentalities for the competitive business purposes and agendas of their constituent members and board members and were used to carry out the conspiracy and unlawful actions set forth herein, namely, to engage in an unreasonable restraint on trade by shutting down the business of

7

an innovative competitor, HQ, and otherwise frustrate HQ's attempt to compete in the market dominated by Defendants.

18.   HQ became a MiRealSource MLS member and shareholder on or about April 15, 2002.

19.   HQ became a Realcomp MLS member and subscriber on or about October 2001.

20.   As a member of the MiRealSource MLS, HQ was required to submit certain of its listings to the MiRealSource MLS for posting on the MLS, and was authorized to access and use MiRealSource MLS Compilation Data in compliance with the MiRealSource Rules and Regulations.  A copy of the MiRealSource Rules and Regulations at issue is attached hereto as Exhibit A.

21.   The MiRealSource Rules and Regulations at issue did not prohibit HQ from downloading the MiRealSource MLS Compilation Data or from allowing HQ's agents and/or buying clients to search the MiRealSource MLS Compilation Data for available properties.  The MiRealSource Rules and Regulations at issue did not allow MiRealSource to discriminate among members by denying access to MiRealSource MLS Compilation Data to members that were in compliance with the MiRealSource Rules and Regulations.

22.   As a subscriber to the Realcomp MLS, HQ was required to submit certain of its listings to the Realcomp MLS for posting on the MLS, and was authorized to access and use the Realcomp MLS Compilation Data in compliance with the Realcomp Rules and Regulations.  A copy of the Realcomp Rules and Regulations at issue is attached hereto as Exhibit B.

23.     The Realcomp Rules and Regulations at issue did not prohibit HQ from downloading the Realcomp MLS Compilation Data or from allowing HQ's agents and/or buying clients to search the Realcomp MLS Compilation Data for available properties. The Realcomp Rules and Regulations at issue did not allow Realcomp to discriminate among members by denying access to Realcomp MLS Compilation Data to members that were in compliance with the Realcomp Rules and Regulations.

24.     On or about May 16, 2003, HQ received notification from MiRealSource that MiRealSource was terminating HQ's rights to access MiRealSource MLS Compilation Data, claiming that HQ's use of that data was in violation of the Rules and Regulations at issue.

25.     On or about May 19, 2003, Realcomp terminated HQ's right to access Realcomp MLS Compilation Data, claiming that HQ's use of that data was in violation of the Realcomp Rules and Regulations at issue. Although Realcomp partially restored HQ's access in some regards, Realcomp persisted in asserting its right to deny HQ access based on purported rule violations.

26.     On or about May 20, 2003, both Defendants shut off HQ's access to their respective MLSs within approximately 24 hours of one another.

27.     HQ subsequently received restored access in August 2003 but, by that time, HQ's business was in disarray. HQ was forced to refund a substantial amount of fees collected prior to Defendants' shutting off of their respective MLS services and also to lay off employees. Defendants subsequently enacted new rules that prohibited HQ's business model and thus would have required that HQ comport with the "traditional" business model dictated by Defendants. As a direct result, HQ was put out of business.

9

28.     As a consequence of HQ's purported "violations" of the MiRealSource Rules and Regulations, MiRealSource prevented HQ from posting its selling clients' listings on the MiRealSource MLS and denied HQ and its buying clients access to MiRealSource MLS Compilation Data.

29.     As a consequence of HQ's purported "violations" of the Realcomp Rules and Regulations at issue, Realcomp previously threatened to prevent HQ from posting its selling clients' listings on the Realcomp MLS and denied HQ and its buying clients access to Realcomp MLS Compilation Data.

30.     At all times relevant to its Complaint, HQ was in compliance with the respective Rules and Regulations at issue of MiRealSource and Realcomp.

31.     HQ owed contractual obligations to its selling clients pursuant to its prior agreements with its selling clients. According to the terms of those agreements, HQ was required to, among other things, cause the selling clients' listings to be posted on an MLS such as MiRealSource and/or Realcomp.

32.     Defendants' prior contentions that HQ was in violation of Defendants' respective Rules and Regulations was a pretext designed to destroy HQ and its innovative business model by denying HQ access to data essential to compete in the relevant market and otherwise provide profits and ensure greater and continuing market share to Defendants and their constituent membership of competing real estate brokers and other real estate professionals.

33.     To the extent that any of Defendants' respective Rules and Regulations "prohibited" the use of Defendants' MLS Compilation Data for the operation of HQ's real estate business, any such rules and regulations represented unlawful restraints on trade and competition.

34.     During the brief time HQ was permitted to operate in the relevant market, HQ had over 6,000 registered buying and/or selling clients who used its innovative services.  By impairing HQ's right to post its listings onto their MLSs, and/or by denying HQ and its buying clients access to their MLS Compilation Data, Defendants effectively shut down HQ's business. As a direct and proximate result, HQ lost its client base and HQ's clients and other consumers lost access to the more efficient and economical business model offered by HQ for buying and selling residential real estate.

35.     A relevant market is that for residential real estate brokerage services in Southeastern Michigan (Wayne, Oakland, Macomb, Washtenaw, and Livingston Counties). Another relevant market is that for residential real estate brokerage services in Macomb County, Michigan.

## Count I

## Violation of § 1 of the Sherman Act by Defendant MiRealSource

36.     HQ incorporates by reference as if set forth fully here the preceding paragraphs of its Complaint.

37.     The conduct of MiRealSource detailed herein allegedly taken pursuant to the MiRealSource Rules and Regulations adopted by its Board of Directors and/or shareholders/members, individually and by virtue of its substantial overlapping membership with RealComp, represents a contract, combination or conspiracy, in the form of a boycott or concerted refusal to deal, that unreasonably restrained trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

38.     At all times relevant to this Complaint, MiRealSource had market power in the market for residential real estate brokerage services in Southeastern Michigan, and in the market for residential real estate brokerage services in Macomb County.  It controlled exclusive access to elements essential for effective competition.  One such element was providing access to list properties for sale on the MLS which facilitated the sale of such properties for sellers.  Another such element was its control of access to MLS Compilation Data used for locating real estate for prospective buyers.  Access to these elements was at all relevant times essential for real estate brokers and agents to compete, and could not be reasonably duplicated.  In addition, it was feasible for MiRealSource to provide HQ with access to these essential elements (as evidenced by the fact that it had done so in the recent past).

39.     The members of MiRealSource that agreed to exclude HQ from posting its listings on the MiRealSource MLS and from accessing the MiRealSource MLS Compilation Data are economic competitors of HQ who were at all relevant times motivated by a desire to maintain high prices for real estate brokerage services, to protect the traditional manner in which real estate brokering services have been provided, and to injure, cripple and eliminate competition.  MiRealSource engaged in these anti-competitive acts with the specific intent of adversely injuring, crippling and eliminating competition in the relevant market.

40.     MiRealSource's conduct substantially and adversely affected competition by, among other things, depriving consumers of substantial competition in the form of better pricing, better services, a wider variety of services, and more efficient access to information and realty services.

12

41.     MiRealSource's conduct was not, and cannot, be justified on the ground that it accomplished a goal of justifying self-regulation. In any event, MiRealSource's conduct was not reasonably related to any such goal.

42.     As a consequence of MiRealSource's unlawful conduct, HQ was injured in its business or property and suffered substantial damages, including past and present lost revenues and profits, market share, and goodwill and harm to HQ's reputation. HQ seeks actual damages, interest on actual damages, treble damages, and the cost of suit including reasonable attorneys' fees, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a) (1994).

## Count II

### MiRealSource's Violation of The Michigan Antitrust Reform Act

43.     HQ incorporates by reference as if set forth fully here the preceding paragraphs of its Complaint.

44.     The conduct of MiRealSource detailed herein, allegedly taken pursuant to the MiRealSource Rules and Regulations at issue adopted by its Board of Directors and/or shareholders/members, individually and by virtue of its substantial overlapping membership with RealComp, is a contract, combination or conspiracy, in the form of a boycott or concerted refusal to deal, that unreasonably restrains trade in violation of the Michigan Antitrust Reform Act, M.C.L.A. §445.771 *et. seq.*

45.     Defendant's wrongful conduct directly harmed a business with it principal place of business in Michigan and directly harmed consumers in the State of Michigan.

13

46.     This Court has jurisdiction over this claim based on principles of supplemental jurisdiction.

47.     Pursuant to Section 8 of the Michigan Antitrust Reform Act, M.C.L.A. §445.778, HQ seeks its actual damages, interest on actual damages, and the cost of suit including reasonable attorneys' fees.  In addition, HQ seeks treble damages for MiRealSource's flagrant and intentional violations of Michigan law pursuant to Section 8(2) of the Michigan Antitrust Reform Act, M.C.L.A. §445.778.

## Count III

### Defendant MiRealSource's Tortious Interference With HQ's Contractual Relationships

48.     HQ incorporates by reference as if set forth fully here the preceding paragraphs of its Complaint.

49.     HQ previously had contractual relationships with its selling clients as their broker/agent.  HQ previously entered into a number of contracts obligating HQ to provide broker/agent services to its selling clients.

50.     HQ provided notice to MiRealSource that its attempts to terminate and the actual termination of HQ's ability to submit its selling clients' listing data to the MiRealSource MLS would cause a breach of contractual relationships between HQ and its selling clients.

51.     Despite HQ's compliance with all applicable MiRealSource Rules and Regulations at issue, MiRealSource knowingly, intentionally, and unlawfully terminated HQ's access to the MiRealSource MLS thereby inducing and/or causing a breach of the contractual

relationships between HQ and its selling clients, and causing HQ's selling clients to withdraw their listings from HQ.

52.     As a result of MiRealSource's actions, the prior contracts between HQ and its selling clients were breached and HQ suffered damages, including but not limited to loss of business, damage to its business reputation and goodwill, and other monetary damages.

53.     In addition, by terminating HQ's access, MiRealSource impaired HQ's ability to enter into additional contractual relationships with sellers who would enter into contracts with HQ, *but for* MiRealSource's actions.

### Prayer For Relief Against MiRealSource

WHEREFORE, Plaintiff prays for judgment against Defendant MiRealSource as follows:

A.     Award HQ its actual damages in excess of $10,000,000 sustained as a result of Defendant's illegal, unlawful and improper actions, trebled as provided by § 4 of the Clayton Act (15 U.S.C. § 15) and § 8 of the Michigan Antitrust Reform Act (M.C.L.A. §445.778);

B.     Award HQ its costs and expenses, including reasonable attorneys' fees as provided by § 4 of the Clayton Act (15 U.S.C. § 15) and § 8 of the Michigan Antitrust Reform Act (M.C.L.A. §445.778); and,

C.     Grant HQ any other relief and/or damages that this Court deems just and equitable.

### Count IV

### Violation of § 1 of the Sherman Act by Defendant Realcomp

54.     HQ incorporates by reference as if set forth fully here the preceding paragraphs of its Complaint.

55. As detailed herein, the conduct of Realcomp, allegedly taken pursuant to the Realcomp Rules and Regulations at issue and adopted by the members of Realcomp's Board of Governors and/or Realcomp's various constituent realtor boards, individually and by virtue of its substantial overlapping membership with MiRealSource, is a contract, combination or conspiracy, in the form of a boycott or concerted refusal to deal, that unreasonably restrains trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

56. At all times relevant to this Complaint, Realcomp had market power in the market for residential real estate brokerage services in Southeastern Michigan. It controlled exclusive access to elements essential for effective competition. One such element was providing access to list properties for sale on its MLS which facilitates the sale of such properties for sellers. Another such element was its control of access to MLS Compilation Data used for locating real estate for prospective buyers. Access to these elements was essential to compete, and could not be reasonably duplicated. In addition, it was at all relevant times feasible for Realcomp to provide HQ with access to these essential elements (as evidenced by the fact that it had previously done so).

57. The members of Realcomp that agreed and/or threatened to exclude HQ from posting its listings on the Realcomp MLS and from accessing the Realcomp MLS Compilation Data are economic competitors of HQ who were motivated by a desire to maintain high prices for real estate brokerage services, to protect the traditional manner in which real estate brokering services have been provided, and to injure, cripple and eliminate competition. Realcomp engaged in these anti-competitive acts with the specific intent of adversely injuring, crippling and eliminating competition in the relevant market.

58.     Realcomp's conduct substantially and adversely affected competition by, among other things, depriving consumers of substantial competition in the form of better pricing, better services, a wider variety of services, and more efficient access to information and realty services.

59.     Realcomp's conduct is not, and cannot, be justified on the ground that it accomplished a goal justifying self-regulation. In any event, it was not reasonably related to any such goal.

60.     As a consequence of Realcomp's unlawful conduct, HQ has been injured in its business or property and has suffered damages.   HQ seeks actual damages, treble damages, interest on actual damages, and the cost of suit including reasonable attorneys' fees, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a) (1994).

## Count V

### Realcomp's Violation of The Michigan Antitrust Reform Act

61.     HQ incorporates by reference as if set forth fully here the preceding paragraphs of its Complaint.

62.     As detailed herein, the conduct of Realcomp, allegedly taken pursuant to the Realcomp Rules and Regulations at issue and adopted by the members of Realcomp's Board of Governors and/or Realcomp's various constituent realtor boards, individually and by virtue of its substantial overlapping membership with MiRealSource, is a contract, combination or conspiracy, in the form of a boycott or concerted refusal to deal, that unreasonably restrains trade in violation of the Michigan Antitrust Act, M.C.L.A. §445.771 *et. seq.*

17

63.     Realcomp' wrongful conduct directly harmed a business with it principal place of business in Michigan and directly harmed consumers in the State of Michigan.

64.     This Court has jurisdiction over this claim based on principles of supplemental jurisdiction.

65.     Pursuant to Section 8 of the Michigan Antitrust Reform Act, M.C.L.A. §445.778, HQ seeks actual damages, interest on actual damages, and the cost of suit including reasonable attorneys' fees. In addition, HQ seeks treble damages for Realcomp's flagrant and intentional violations of Michigan law pursuant to Section 8(2) of the Michigan Antitrust Reform Act, M.C.L.A. §445.778.

## Count VI

### Defendant MiRealSource's Tortious Interference With HQ's Contractual Relationships

66.     HQ incorporates by reference as if set forth fully here the preceding paragraphs of its Complaint.

67.     HQ previously had contractual relationships with its selling clients as their broker/agent. HQ previously entered into a number of contracts obligating HQ to provide broker/agent services to its selling clients.

68.     HQ provided notice to Realcomp that its attempts to terminate and the actual termination of HQ's ability to submit its selling clients' listing data to the Realcomp MLS would cause a breach of contractual relationships between HQ and its selling clients.

69.     Despite HQ's compliance with all applicable Realcomp Rules and Regulations at issue, Realcomp knowingly, intentionally, and unlawfully terminated HQ's access to the Realcomp MLS thereby inducing and/or causing a breach of the contractual relationships

between HQ and its selling clients, and causing HQ's selling clients to withdraw their listings from HQ.

70.     As a result of Realcomp actions, the prior contracts between HQ and its selling clients were breached and HQ suffered damages, including but not limited to loss of business, damage to its business reputation and goodwill, and other monetary damages.

71.     In addition, by terminating HQ's access, Realcomp impaired HQ's ability to enter into additional contractual relationships with sellers who would enter into contracts with HQ, *but for* Realcomp actions.

**Prayer For Relief Against Realcomp**

WHEREFORE, Plaintiff prays for judgment against Realcomp as follows:

A.      Award HQ its actual damages in excess of $10,000,000 sustained as a result of Defendant's illegal, unlawful and improper actions, trebled as provided by § 4 of the Clayton Act (15 U.S.C. § 15) and § 8 of the Michigan Antitrust Reform Act (M.C.L.A. §445.778);

B.      Award HQ its costs and expenses, including reasonable attorneys' fees as provided by § 4 of the Clayton Act (15 U.S.C. § 15) and § 8 of the Michigan Antitrust Reform Act (M.C.L.A. §445.778); and,

C.      Grant HQ any other relief and/or damages that this Court deems just and equitable.

## DEMAND FOR TRIAL BY JURY

Plaintiff Home Quarters Real Estate Group, LLC, by and through its attorneys, Dickinson Wright PLLC, hereby demands a trial by jury of all issues so triable.

Respectfully submitted,

DICKINSON WRIGHT PLLC

By: _____

Jonathan B. Groat (P58547)
Attorneys for Plaintiff
301 E. Liberty, Suite 500
Ann Arbor, MI 48104-2266
Phone: (734) 623-1629
Fax: (734) 623-1625
Email: jgroat@dickinsonwright.com

Dated: May 14, 2007

ANNARBOR 35337-1 36595v3

20

Exhibit A



# MiRealSource
## Michigan Regional Data Exchange



# RULES
# &
# REGULATIONS

# RULES AND REGULATIONS OF THE
# MICHIGAN REGIONAL DATA EXCHANGE

## ARTICLE I - PARTICIPATION

**Section 1.**

Application for participation shall be made in such manner and form as may be prescribed by the Board of Directors of the MLS and made available to any Shareholder. The application form shall contain a signed statement agreeing to abide by these Bylaws and any other applicable Rules and Regulations of the Service as from time to time adopted or amended.

**Section 2.**

(a)     The MLS Services are for the exclusive use of its Shareholders and Affiliates and may not be repackaged or resold to the general public in any manner.

(b)     Each Shareholder requesting MLS Service must maintain a physical business office that is located in a properly zoned commercial area.

(c)     Any change of ownership or the entry into any relationship which might affect the conduct or methods of operation of the Shareholder or Affiliate shall be reported to the Board of Directors within thirty (30) days thereof in such detail as the Directors may request.

(d)     Any Shareholder or Affiliate who relocates their office shall immediately notify the MLS.

(e)     Shareholders or Affiliates of the Service may discontinue the Service by giving written notice.  The Shareholder or Affiliate may reapply to the Service by making formal application in the manner prescribed for new applicants for participation provided all past dues and fees are fully paid.

(d)     The Shareholder may keep his share of stock inactive if he desires.

(g)     The Affiliate has one (1) year to reapply without having to pay an application fee.

**Section 3.**

Shareholders and any licensed agents under the Shareholder, in good standing, shall have the opportunity to be appointed to Committees.

1

Shareholders, Licensees of Shareholders and Affiliates in good standing shall be entitled to the benefits of MLS services.

"In good standing" is defined as: Shareholders or Affiliates who are not under suspension for nonpayment of dues or fees, or otherwise through action by the Board of Directors due to violation of the Bylaws and/or Rules and Regulations.

## Section 4.

Use of information developed by or published by the Multiple Listing Service is strictly limited to the activities authorized under a Shareholder's or Affiliate's licensure or certification, and unauthorized uses are prohibited.

## ARTICLE II - DUES, FEES AND FINANCES

## Section 1.

(a)     Access Fees will be billed monthly.  These fees will be assessed to all MLS Shareholders based upon the number of licensees with the MLS Shareholder office(s).  The Access Fees will be assessed according to the number of licensees within an MLS Shareholders office on the 1st day of the month for that month.  (See attached fee schedule).  Each licensee will be assessed Access Fees beginning the date that individual's license was issued to the MLS Shareholders Office.

(b)     All MLS fees, dues and charges shall be assessed only to the MLS Broker/Shareholder.  Payment of such fees will be accepted from the Broker and not from non-principal brokers or sales licensees affiliated with the Broker.

## Section 2.

Fees together with any other charges incurred by the Shareholder or Affiliate and owed to the MLS shall be due at the first of each month and shall be payable within thirty (30) days thereafter.

## Section 3.

Any Shareholder or Affiliate whose fees or other charges are delinquent thirty (30) days from due date shall have all rights, privileges, and services suspended provided that written notice has been given at least five (5) days prior to suspension.  If fees or any other charges are delinquent for sixty (60) days after due date, such Shareholder or Affiliate participation shall automatically be terminated.  Any Shareholder or Affiliate whose participation has been

2

terminated may apply for reinstatement by filing an application in the manner prescribed for new applicants after making payment in full for all past due accounts plus any amount determined by the Board of Directors as being due to MLS.

**Section 4.**

The suspension or termination of a Shareholder or Affiliate shall suspend or terminate all MLS services to any licensees or employees of its firm, partnership, corporation, trust or any form of entity.

**Section 5.**

If any Shareholder or Affiliate for any reason has its participation in MLS terminated, said Shareholder or Affiliate shall forfeit all claims to any prepaid dues and other costs.

## ARTICLE III - ENFORCEMENT OF BYLAWS, RULES AND DISPUTES

**Section 1.**

The Board of Directors shall give consideration to all written complaints from Shareholders or Affiliates having to do with a violation of the Bylaws or Rules and Regulations.

**Section 2.**

If the alleged offense is a violation of the Bylaws or Rules and Regulations, it may be considered by the Board of Directors, or by a committee appointed for that purpose, and if a violation is determined, the Committee or the Board of Directors may direct the imposition of sanction, provided if the sanction is imposed by the Committee, the recipient of said sanction may appeal it to the Board of Directors.

**Section 3.**

If the alleged offense includes a component of ethics or a non-MLS related violation(s), the complaint relating to violations(s) other than MLS Rules and Regulations violation(s), (such as, without limitation, alleged transgression of ethical or professional standards) shall be referred by the MLS to the Board of REALTORS® /Association through which the respondent participates.

3

## ARTICLE IV - ARBITRATION OF DISPUTES

**Section 1.**

Shareholders agree to arbitrate disputes involving contractual issues and questions, and specific non-contractual issues and questions defined in Standard of Practice 17-4 of the Code of Ethics of the National Association of REALTORS® with MLS participants in different firms arising out of their relationship as MLS participants.

**Section 2.**

If all the disputants are members of the same Board or Association of REALTORS® or have their principal place of business within the same Board's or Association's territorial jurisdiction, they shall arbitrate pursuant to the procedures of that Board or Association of REALTORS®.

**Section 3.**

If the disputants are members of different Boards or Associations of REALTORS® or if their principal place of business is located within the territorial jurisdiction of different Boards or Associations of REALTORS®, they remain obligated to arbitrate in accordance with the procedures of the Michigan Association of REALTORS®.

**Section 4.**

The Directors may release the parties from their obligation to arbitrate, if the Directors determine that the dispute should not be arbitrated because of the amount involved or the complexity of the controversy.


## ARTICLE V - RULES OF OPERATION

### LISTING PROCEDURE

**Section 1.**

(a)     All Exclusive Right to Sell listings of the following types taken by a Shareholder, whose office(s) participate in MLS within its territory shall be taken on an Exclusive Right to Sell listing form approved by the MLS for processing and written verification of said listings shall be delivered to the MLS office:

1.     Single family homes for sale or exchange.

4

2. Two-family, three-family and four-family residential buildings for sale or exchange, except new construction of one to four family residential dwellings.
3. New construction of 1 to 4 family residential dwellings
4. Apartments or Multiple Dwellings over 4 units
5. Subdivided Vacant Lots
6. Acreage and Farms
7. Commercial Property
8. Industrial Property
9. Business Opportunities
10. Leases

(b)    Listing data sheet must be submitted by fax, mail or hand delivered for confirmation.

(c)    · All listings taken on a form indicating it is to be submitted to the MLS shall be delivered to the MLS within forty-eight (48) hours after all necessary signatures of sellers have been obtained, excepting Saturdays, Sundays and holidays. All unconfirmed listings shall be removed from the file within ten (10) days of the listing date.

(d)    All listings not submitted within 48 hours of listing date shall be subject to a late listing fine.

**Section 1.1.**

LISTINGS SUBJECT TO RULES AND REGULATIONS OF THE SERVICE: Any listing taken on a contract to be processed by MLS is subject to the MLS Rules and Regulations immediately upon the signatures of the sellers being obtained. This rule also applies to listings, which are sold prior to submission to the MLS.

**Section 1.2.**

EXEMPTED LISTINGS:

(a)    If the seller refuses to permit the property to be listed through MLS, the participant may still take a listing and such listing shall be filed with the MLS office; however, it shall not be disseminated by MLS. Filing of such an office listing with MLS shall be accompanied by a certification signed by the seller that he does not desire the listing information to be broadcast to other participants.

(b)    Any new listing submitted to the MLS that includes a "do not show until" clause must include this information in the remarks section of the profile form if applicable. In addition, written authorization from seller must be included stating "no shows until".

5

(c)     The listing shall be marked as having an exception in the system to flag other participants of the "no showings until" condition.

**Section 1.3.**

CHANGE OF STATUS OF LISTING: Any change in listed price or other change in original listing agreement shall be made only when authorized in writing by the owner and listing broker, and shall be filed with the MLS within forty-eight (48) hours (except Saturdays, Sundays and holidays) after said authorized change is received by the listing broker.

**Section 1.4.**

WITHDRAWAL OF LISTING PRIOR TO EXPIRATION: Listed property may be withdrawn from MLS by the listing broker before expiration date of the listing agreement provided notice is filed with MLS office, including a copy of the agreement between the owner and Participant which authorizes withdrawal.

**Section 1.5.**

LISTING PRICE SPECIFIED: The MLS shall not accept net listings or open listings.

**Section 1.6.**

LISTING MULTIPLE UNIT PROPERTIES: All properties which are to be sold or which may be sold separately must be listed individually.

**Section 1.7.**

NO CONTROL OF COMMISSION RATES OR FEES CHARGED BY PARTICIPANT: The MLS shall not fix, control, recommend, suggest, or maintain commission rates or fees for service to be rendered by MLS Participants; and further, the MLS shall not fix, control recommend, suggest, or maintain any division of commissions or fees between cooperating Participants or Non-Participants.

**Section 1.8.**

EXPIRATION, EXTENSION, AND RENEWAL OF LISTINGS:

(a)     Any listing filed with the MLS automatically expires at 11:59 p.m., on the expiration date.

(b)     A written report shall be executed by sellers and the listing broker, indicating any price change or new expiration date.

6

(c)     A twenty-four (24) hour grace period is allowed (not to include weekends or holidays) when submitting an extension to the MLS office after the listing has expired, to submit the signed extension and have the listing put back to active.

**Section 1.9.**

EXPIRATION DATE ON LISTINGS: Listings submitted to the MLS shall bear a definite and final expiration date.

**Section 1.10.**

COMPLETION OF LISTING: It is the responsibility of the Shareholder to make certain all new listings are complete prior to submission of the written property data form to the MLS office for processing. An incomplete listing shall be subject to a fine, as determined by the Board of Directors.

**Section 1.11.**

JURISDICTION:  Only listings of the designated type of property located within the MLS jurisdiction, as submitted by registered Shareholder offices, are required to be submitted to the Service.  Listings of property located outside the designated jurisdiction will be accepted if submitted by Shareholder.

**NOTE: The Directors have determined the jurisdiction of the MLS is the State of Michigan.**

**Section 1.12.**

LISTINGS OF SUSPENDED SHAREHOLDERS: When a Shareholder of the Service is suspended from the MLS for failing to abide by a membership duty (i.e., violation of the Bylaws, Rules and Regulations, or other membership obligation except failure to pay appropriate dues, fees or charges), all listings currently filed with the MLS by the suspended Shareholder shall, at the Shareholder's option, be retained in the Service until sold, withdrawn or expired, and shall not be renewed or extended by the MLS beyond the termination date of the listing agreement in effect when the suspension became effective. If a Shareholder has been suspended from the MLS for failure to pay appropriate dues, fees or charges, the MLS is not obligated to provide MLS services, including continued inclusion of the suspended Shareholder's listings in the MLS compilation of current listing information.  Prior to any removal of a suspended Shareholder's listings from the MLS, the suspended Shareholder should be advised in writing of the intended removal so that the suspended Shareholder may advise his/her clients.

**Section 1.13.**

LISTINGS OF TERMINATED SHAREHOLDERS: When a Shareholder of the Service is expelled from the MLS for failing to abide by a membership duty (i.e., violation of the Bylaws, Rules and Regulations, or other membership obligations except failure to pay appropriate dues, fees or charges), all listings currently filed with the MLS shall, at the expelled Shareholder's option, be retained in the Service until sold, withdrawn or expired, and shall not be renewed or extended by the MLS beyond the termination date of the listing agreement in effect when the expulsion became effective. If a Shareholder has been expelled from the MLS for failure to pay appropriate dues, fees or charges, the MLS is not obligated to provide MLS services, including continued inclusion of the expelled Shareholder's listing in the MLS compilation of current listing information. Prior to any removal of an expelled Shareholder's listings from the MLS, the expelled Shareholder should be advised in writing of the intended removal so that the expelled Shareholder may advise his/her clients.

**Section 1.14.**

LISTINGS OF RESIGEND SHAREHOLDERS: When a Shareholder or Affiliate resigns from the MLS, the MLS is not obligated to provide services, including continued inclusion of the resigned Shareholder's or Affiliate's listings in the MLS compilation of current listing information. Prior to any removal of a resigned Shareholder's or Affiliate's listings from the MLS, the resigned Shareholder or Affiliates should be advised in writing of the intended removal so that the resigned Shareholder or Affiliate may advise his clients.

**Section 1.15.**

SUBMISSION AND PRESENTATION OF OFFERS: The listing broker must make arrangements to present offer as soon as possible during normal business hours, or give the cooperating broker a satisfactory reason for not doing so. Also, the listing broker shall provide reasonable alternatives to resolve any necessary delays.

The cooperating participant (subagent or buyer agent) or his representative shall have the right to participate in the presentation to the seller or lessor of any offer he secures to purchase or lease. This right does not create the option to be present during any subsequent discussion(s) (including a conversation which evaluates the offer immediately following the presentation) between the listing participant and the seller or lessor with respect to the presented offer.

The presentation of the offer shall be under the direction and control of the listing broker.

## SELLING PROCEDURES

**Section 2.**

SHOWINGS: Appointments for showings of listed properties filed with the MLS shall be made through the listing broker.

It is the responsibility of the listing office to respond to a request for a showing of a listed property within twenty-four (24) hours of the request.

The listing broker shall cooperate in the prompt showing of listed properties and shall in no way hinder or hamper the cooperating broker in showing the property.

**Section 2.1.**

NEGOTIATIONS: All negotiations with the seller shall be conducted through the listing broker's office. If, however, a response is not received from the listing office within twenty-four (24) hours, the cooperating broker or one of his/her licensees shall have the option to deliver a signed copy of the offer in a sealed envelope to listing broker's office and shall obtain a receipt showing time and date of delivery. The envelope containing said offer shall remain sealed until the offer is presented to the seller for consideration or acceptance and opened in the presence of the cooperating broker or one of his/her licensees. Note: The cooperating broker must disclose his/her agency status to the listing broker at first contact with the listing broker (in person, by telephone or in writing).

**Section 2.2.**

SUBMISSION OF WRITTEN OFFERS: Brokers and his/her licensees shall endeavor to draft all offers and counter-offers in writing.

Verbal offers are not enforceable by law.

The listing broker or one of his/her licensees shall submit to the seller all written offers until closing unless precluded by law, government rule, regulation or agreed otherwise in writing between the seller and the listing broker.

Multiple offers on any property must be presented to the seller at the same appointed time but not simultaneously.

**Section 2.4.**

CONFIDENTIALITY OF PRICE AND TERMS: No one shall divulge to anyone other than the broker, sales manager or co-lister the terms, price or conditions recited in any Offer

to Purchase presented cooperatively, on a specific property before the offer is presented to the seller.

**Section 2.5.**

### REPORTING SALES UNDER THE PENDING CATEGORY

Sales shall be reported immediately to the MLS Office by the listing broker in a manner prescribed by the Board of Directors.   A listing must be reported "pending" within five (5) days after the seller(s) has/have accepted a purchase agreement (excluding holidays and weekends).  The listing is to be reported as "sold" immediately upon the closing of the sale.

A listing must be reported "sold" within 48 hours upon the closing of the sale (excluding holidays and weekends).

**Section 2.6.**

REPORTING RESOLUTIONS OF CONTINGENCIES: Listing broker shall report to the MLS Office within twenty-four (24) hours that a contingency on file with MLS has been fulfilled, renewed or canceled.

**Section 2.7.**

ADVERTISING OF LISTING FILED WITH THE SERVICE: A listing shall not be advertised by any participant other than the listing broker or one of his/her licensees without the prior consent of the listing broker.

Broker Reciprocity advertising is the only exception.

**Section 2.8.**

REPORTING CANCELLATION OF PENDING SALE: The listing broker shall report within forty-eight (48) hours to the MLS Office any sale which has been canceled or falls through, and the listing, if unexpired, is to be reinstated in MLS immediately.


**PROHIBITIONS**


**Section 3.**

INFORMATION FOR PARTICIPANTS ONLY: Information provided by the MLS to the participant shall be considered privileged information by the MLS.  Such information shall be confidential and shall not be made available to non-participants except as permitted by these MLS rules and applicable law.

10

**Section 3.1.**

"FOR SALE" SIGNS":  Only the "For Sale" signs of the listing broker may be placed on a property.

**Section 3.2.**

"SOLD SIGNS":  Only the "Sold" sign of the listing broker may be placed on a property, unless the listing broker authorizes the cooperating broker to post such a sign.

**Section 3.3.**

SOLICITATION OF LISTING FILED WITH THE SERVICE: Participants shall not solicit a listing on currently listed property filed with the MLS unless such solicitation is consistent with Article 16 of the REALTORS® Code of Ethics, its Standards of Practice and its Case interpretations.  Upon showing a property, anything other than leaving a business card will be interpreted as solicitations.

*Note: This Section is to be construed I a manner consistent with Article 16 of the Code of Ethics and particularly Standard of Practice 16-4.  This Section is intended to encourage sellers/lessors to permit their properties to be filed with the MLS by protecting them from being solicited, prior to expiration of the listing, by brokers and salespersons seeking the listing upon it expiration.*

*Without such protection, a seller/lessor could receive hundreds of calls, communications and visits from brokers and salespersons who have been made aware through MLS filing of the date the listing will expire and desire to substitute themselves for the present broker.*

*This Section is also intended to encourage brokers to participate in the MLS by assuring them that other participants will not attempt to persuade the seller/lessor to breach the listing agreement or to interfere with their attempts to marker the property.  Absent the protection afforded by this Section, Listing Brokers should be most reluctant to generally disclose the identity of the seller/lessor or the availability of the property to other brokers.*

*This Section does not preclude solicitation of listing under the circumstances otherwise recognized by the Standard of Practice related to Article 16 of the Code of Ethics.*

## COOPERATION AND COMPENSATION

**Section 4.**

COMPENSATION SPECIFIED ON EACH LISTING: The listing broker shall specify, on each listing filed with the Multiple Listing Service, the compensation offered to other Multiple Listing Service participants for their services in the sale of such listing. Such offers are unconditional except that entitlement to compensation is determined by the cooperating broker's performance as the procuring cause of the sale (or lease) or as otherwise provided for in this rule. The listing broker's obligation to compensate any cooperating broker as the procuring cause of the sale (or lease) may be excused if it is determined through arbitration that, through no fault of the listing broker and in the exercise of good faith and reasonable care, it was impossible or financially unfeasible for the listing broker to collect a commission pursuant to the listing agreement. In such instances, entitlement to cooperative compensation offered through MLS_would be a question to be determined by an arbitration hearing panel based on all relevant facts and circumstances including, but not limited to, why it was impossible or financially unfeasible for the listing broker to collect some or all of the commission established in the listing agreement; at what point in the transaction did the listing broker know (or should have known) that some or all of the commission established in the listing agreement might not be paid; and how promptly had the listing broker communicated to cooperating brokers that the commission established in the listing agreement might not be paid.

(a) In filing a property with the Multiple Listing Service the Shareholder making blanket unilateral offer of cooperation and compensation to the other MLS participants, and shall therefore specify on each listing filed with the Service, the compensation being offered to the other MLS Shareholder. Specifying the compensation on each listing is necessary because the cooperating broker has the right to know what his compensation shall be prior to his endeavor to sell.

The listing broker retains the right to determine the amount of compensation to other participants (acting as subagents, buyer agents, or in other agency or nonagency capacities defined by law) which may be the same or different.

This shall not preclude the listing broker from offering any MLS Shareholder compensation other than the compensation indicated on his listings as published by the MLS, provided the listing broker informs the other broker, in writing, in advance of requesting the appointment, and provided that the modification in the specified compensation is not the result of any agreement among all or any other participants in the Service. Any superseding offer of compensation must be expressed as either a percentage of the gross sales price or as a flat dollar amount.

12

The MLS does not have a rule requiring the listing broker to disclose the amount of total negotiated commission in his listing contract, and the MLS does not publish the total negotiated commission on a listing that has been submitted to the MLS by a Shareholder.

The compensation specified on listings filed with the MLS shall appear in one of two forms. It is essential and appropriate that the information to be published shall clearly inform the participants as to the compensation they will receive in cooperative transactions unless advised otherwise by the listing broker in writing in advance. The compensation specified on listings published by the MLS shall be shown in one of the following forms:

1.  By showing a percentage of the gross selling price.
2.  By showing a definite dollar amount.

(b)     The listing broker may, from time to time, adjust the compensation being offered to other MLS participants for their services with respect to any listing by advance published notice to the Service so that all participants will be advised.

(c)     The Multiple Listing Service shall make no rule on the division of commissions between Shareholders and non-participants. This should remain solely the responsibility of the listing broker.

(d)     The Multiple Listing Service, at its discretion, may adopt rules and procedures enabling listing brokers to communicate to potential cooperating brokers that gross commissions established in listing contracts are subject to court approval or to lender approval; and that compensation payable to cooperating brokers may be reduced if the gross commission established in the listing contract is reduced by a court or by a lender. In such instances, the fact that the gross commission is subject to court or to lender approval and either the potential reduction in compensation payable to cooperating brokers or the method by which the potential reduction in compensation will be calculated must be clearly communicated to potential cooperating brokers as soon as such knowledge is known to listing broker.

**Section 4.1.**

PARTICIPANT AS PRINCIPAL: If a Shareholder or any licensee (or licensed or certified appraiser) affiliated with a Shareholder has any interest in property, the listing of which is to be disseminated through the MLS, that person shall disclose that interest when the listing is filed with the MLS and such information shall be disseminated to all MLS participants.

**Section 4.2.**

PARTICIPANT AS PURCHASER: If a Shareholder or any licensee affiliated with a Shareholder wishes to acquire an interest in property listed with another Member, such contemplated interest shall be disclosed to the listing broker not later than the time an offer to purchase is submitted to the listing broker.

## SERVICE FEES AND CHARGES

**Section 5.**

      <u>SERVICE FEES AND CHARGES:</u> The service charges for operation of the MLS are in effect to defray the costs of the Service and are subject to change from time to time by the Directors of the Michigan Regional Data Exchange, Inc.

## COMPLIANCE WITH RULES

**Section 6.**

      <u>COMPLIANCE WITH RULES:</u>  The following action may be taken for noncompliance with the rules:

    (a)    For failure to pay any service charge or fee within one (1) month of the date due, and provided that at least five (5) days notice has been given, the Service shall be suspended until service charges or fees are paid in full.

    (b)    For failure to comply with any other rule, the provisions of Article IV, Sections 1 and 2 shall apply.

**Section 6.1.**

      <u>APPLICABILITY OF RULES TO USERS AND/OR SUBSCRIBERS:</u> Non-principal brokers, sales licensees, appraiser, and others authorized to have access to information published by the MLS are subject to these rules and regulations and may be disciplined for violations thereof provided that the user or subscriber has signed an agreement acknowledging that access to and use of MLS information is contingent on compliance with the rules and regulations. Further, failure of any user or subscriber to abide by the rules and/or any sanctions imposed for violations thereof can subject the participant to the same or other discipline.  This provision does not eliminate the Shareholder's ultimate responsibility and accountability for all users or subscribers affiliated with the Shareholder.

14

# MLS FINES

| No. | VIOLATIONS | FINES |
|---|---|---|
| 1. | **Listing Omissions** – Note: If the property data sheet is *missing* information or has *incorrect* information (such as incorrect map coordinates) or if the information in the computer *doesn't match* the data sheet, you will be notified by the MLS and a fine will be issued. | 1st Offense: $4.00<br><br>2 or more: $1.00<br><br>Sq. Footage: $6.00 |
| 2. | **Failure to Submit Listing Within 7 Days from Date of Listing** – Note: This applies to ALL listings take in the State of Michigan must be submitted to the MLS, this applies to all listings including any office exclusive or "Do Not Publish" listings.  If listing is not submitted within seven (7) days a fine will be issued. | $100.00 |
| 3. | **Submission of a Listing Without Proper Written Authorization** – All listings taken in the State of Michigan must be submitted with proper written authorization (signatures and dates) from the Seller(s) or a fine will be issued. | $200.00 |
| 4. | **Late Listing Fine** – All listings taken in the State of Michigan must be submitted to the MLS within 48 hours of the date of final signatures (not counting weekends and holidays).  This includes submissions of the property data sheet to the MLS within 48 hours. | $30.00 |
| 5. | **Late Pending Fine** – When an offer to purchase has been accepted, the listing must be reported pending within 48 hours, not counting weekends and holidays (in accordance with Section 2.5 of the MLS Rules & Regulations). | $30.00 |
| 6. | **Late Submittal of the Pending Report** – This pending report must be returned to the MLS office by the last business day of the month.  The pending report is <u>only sent</u> if an office has listing in a pending status for <u>60 days or more</u>. (The report is sent with the monthly office statement on the 1st of every month) | $50.00 |
| 7. | **Late Sold Report Fine** – When a sold is not reported within 48 hours, not counting weekends and holidays, (in accordance with Section 2.5 of the MLS Rules & Regulations) this fine will be issued. | $30.00 |
| 8. | **Incorrect Reporting of Selling Office** – When a selling office is reported incorrectly on a closed listing, this fine will be issued upon discovery. | $50.00 |

15

9.   **Incorrect Reporting of Selling Price** – When selling price is reported
     incorrectly on a closed listing, this fine will be issued.                                          $50.00

10.  **"No Showings Until"** – If a listing is held from the system because the seller
     requests it, a letter (signed by the seller(s) and Broker <u>MUST</u> be submitted
     to the MLS office stating that their desire is to held back showing the exact                       $100.00
     dates. If the letter is not received, a fine will be issued. *We must have a*
     *letter on file.*

11.  **New Construction** – If a new construction listing is submitted and the
     feature codes N1 or N2 is not specified on the computer <u>and</u> the data sheet,
     a fine is issued. This is to avoid photographers from being dispatched                              $30.00
     needlessly.

12.  **Non-Reporting of a Contingency on a Listing** – If a listing has a 72 hour
     ·contingency on it, it <u>MUST</u> be marked as "YES" under exceptions and noted
     in the remarks followed by the date the contingency ends. If not, a fine may                        $100.00
     be issued.

13.  **Duplicate Listings** – This fine is issued if a duplicate listing on the same
     property is entered into the system. Upon discovery, the 2nd entry will be                     $30.00
     automatically deleted and the fine is issued.

14.  **Wrong Area Code** – Listings are sometimes knowingly entered in the
     system under the wrong area for marketing reasons, etc. When discovered,
     the listing will be moved to the correct area and a fine will be issued. A                          $30.00
     special fine was created for "wrong area" because of the importance of
     placing listings in the correct area on the system.

15.  **Class Attendance** – If you schedule to attend a class and do not show up
     without canceling, this fine will be issued. Cancellation <u>MUST</u> be made <u>NO</u>             $20.00
     <u>LATER</u> than <u>24 HOURS</u> prior to the class date.

16.  **Orientation Fines** – These fines only apply to new MLS members. All new
     agents coming into your office are required to attend an MLS Orientation
     Class for review of the MLS Rules & Policies.

     If attendance is not made after 90 days, the following fines will be issued:

     | | |
     |---|---|
     | Non-attendance (after 90 days) | $10.00 |
     | Non-attendance (after 120 days) | $50.00 |
     | Non-attendance (every month thereafter) | $50.00 |

     *Note: All new agents should be encouraged to call the school (TREEC) at 586/274-*
     *4320 to schedule their attendance to this required class ASAP after they begin.*
     *Please do not confuse this class with the Association/Board required class(es).*

16

17. **Non-Reporting of an Agent Licensed in your Office** – This fine is issued to the broker if it is discovered that there is an agent in your office who is not on file with the MLS after 30 days of becoming licensed with a Shareholder.    $200.00

18. **Failure to Remove "Caravan Tour"** – This fine is issued if an agent fails to remove "Caravan Tour" from a tour list within 1 hour prior to the scheduled inspection.    $25.00

*The fines above may be revised from time to time by the Michigan Regional Data Exchange Board of Directors.*

## CONFIDENTIALITY OF MLS INFORMATION

**Section 7.**

CONFIDENTIALITY OF MLS INFORMATION: Any information provided by the MLS to the participant shall be considered official information of the MLS. Such information shall be considered confidential and exclusively for the use of Shareholders and real estate licensees affiliated with such Shareholders and those Affiliates who are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property and licensed or certified appraisers affiliated with such Affiliates.

**Section 7.1.**

MLS NOT RESPONSIBLE FOR ACCURACY OF INFORMATION: The information published and disseminated by the MLS is communicated verbatim, without change by the MLS, as filed with the MLS by the Shareholder offices. The MLS does not verify such information provided and disclaims any responsibility for its accuracy. Each Shareholder agrees to hold the MLS harmless against any liability arising from any inaccuracy or inadequacy of the information such Shareholder provides.

**Section 7.2.**

ACCESS TO COMPARABLE AND STATISTICAL INFORMATION: The MLS may provide persons who are actively engaged in real estate brokerage, management, mortgage financing, appraising, land development, or building, but who are not participants of the MLS, all information other than current listing information that is generated wholly or in part by the MLS including "comparable" information, "sold" information, and statistical reports. However, it may not be transmitted, retransmitted or provided in any manner to any unauthorized individual, office of firm except as otherwise provided in these Rules and Regulations.

17

## MLS AUTHORITY

**Section 8.**

By the act of submission of any property listing data to the MLS the Shareholder represents that he/she has been authorized to grant and also thereby does grant authority for the MLS to include the property listing data in its copyrighted MLS compilation and also in any statistical report on "Comparables."

**Section 8.1.**

All right, title, and interest in each copy of every Multiple Listing Compilation created and copyrighted by the Michigan Multiple Listing Service, Inc., and in the copyrights therein, shall at all times remain vested in the Michigan Multiple Listing Service, Inc.

**Section 8.2.**

Each participant shall be entitled to lease from the Michigan Multiple Listing Service, Inc., a number of copies of each MLS Compilation sufficient to provide the Shareholder/Affiliate and each person affiliated as a licensee (including licensed of or certified appraisers) with such Shareholder/Affiliate with one copy of such Compilation.   The Shareholder/Affiliate shall pay, for each such copy, the rental fee set by the MLS.

Shareholders/Affiliates shall acquire by such lease only the right to use the MLS Compilations in accordance with these rules.

The term MLS Compilation, as used in Section 10 and 11 herein, shall be construed to include any format in which property listing data is collected and disseminated to the participants, including, but not limited to, bound book, loose-leaf binder, computer data base, card file, or any other format whatever.

This Section should not be construed to require the Shareholder/Affiliate to lease a copy of the MLS Compilation for any licensee (or licensed/certified appraisers) affiliated with the Shareholder/Affiliate who is engaged exclusively in a specialty of the real estate business other than listing, selling or appraising the types of properties which are required to be filed with the MLS, and who does not, at any time, have access to nor use of the MLS information or MLS.

## MLS COMPILATION AND COPYRIGHTS

**Section 9.**

All right, title and interest in each copy of every Multiple Listing Compilation created by the MLS and Shareholder Broker/Owner and in the copyrights therein, shall at all times remain vested in the Shareholder Broker/Owners, which are the Shareholders of Michigan Regional Data Exchange. Each individual Broker/Owner retains all copyright to all listings in their inventory.

## DISTRIBUTION, ETC.

**Section 10.**

DISTRIBUTION: Shareholders/Affiliates shall at all times maintain control over and responsibility for each copy of any MLS Compilation leased to them by the MLS, and shall not distribute any such copies to persons other than persons who are affiliated with such Shareholders/Affiliates as licensees or those individuals who are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property. Use of information developed by or published by the MLS is strictly limited to the activities authorized under a Shareholder's/Affiliate's licensure(s) or certification and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey any right of access to information developed by or published by the MLS where access to such information is prohibited by law.

**Section 10.1.**

DISPLAY PRINT COPY: Shareholders/Affiliates and those persons affiliated as licensees with such Shareholders/Affiliates shall be permitted to display the MLS Compilation in printed copy as approved by the MLS for that purpose, to prospective purchasers only in conjunction with their ordinary business activities of attempting to locate ready, willing, and able buyers for the properties described in said MLS Compilation.

DISPLAY ON INTERNET/COMPUTER: Shareholders, Affiliates and those persons affiliated as licensees with such Shareholders/Affiliates shall be permitted to display the MLS Compilation on Internet/Computer, as outlined in the rules and designed for that purpose, to prospective purchasers only in conjunction with their ordinary business activities of attempting to locate ready, willing, and able buyers for the properties described in said MLS Compilation.

Section 10.2.

REPRODUCTION: Shareholders or their affiliated licensees shall not reproduce any MLS Compilation or any portion thereof except in the following limited circumstances:

Shareholders or their affiliated licensees may reproduce from the MLS Compilation, and distribute to prospective purchasers, a reasonable* number of single copies of property listing data contained in the MLS Compilation which relate to any properties in which prospective purchasers are or may, in the judgment of the Shareholders or their affiliated licensees, be interested.

Reproductions made in accordance with this rule shall be prepared in such a fashion that the property listing data of properties other than that in which the prospective purchaser has expressed interest, or in which the Shareholder or the affiliated licensees are seeking to promote interest, does not appear on such reproduction.

Nothing contained herein shall be construed to preclude any Shareholder from utilizing, displaying, distributing, or reproducing property listing sheets or other compilations of data pertaining exclusively to properties currently listed for sale with the Participant.

Any MLS information, whether provided in written or printed form, provided electronically, or provided in any other form or format, is provided for the exclusive use of the Shareholder and those licensees affiliated with the Shareholder who are authorized to have access to such information. Such information may not be transmitted, retransmitted, or provided in any manner to any unauthorized individual, office or firm.

None of the foregoing shall be construed to prevent any individual legitimately in possession of current listing information, "sold" information, "Comparables," or statistical information from utilizing such information to support an estimate of value on a particular property for a particular client. However, only such information that the MLS has deemed to be nonconfidential and necessary to support the estimate of value may be reproduced and attached to the report as supporting documentation. Any other use of such information is unauthorized and prohibited by these Rules and Regulations.

*It is intended that the participant be permitted to provide prospective purchasers with listing data relating to properties which the prospective purchaser has a bona fide interest in purchasing or in which the participant is seeking to promote interest. The term "reasonable", as used herein, should therefore be construed to permit only limited reproduction of property listing data intended to facilitate the prospective purchaser's decision-making process in the consideration of a purchase. Factors which shall be considered in deciding whether the reproductions made are consistent with this intent, and thus "reasonable" in number, shall include, but are not limited to, the total number of listings in the MLS Compilation, how closely the types of properties contained in such listings accord with the prospective purchaser's expressed desires and ability to purchase, whether the reproductions were made on a selective

basis, and whether the type of properties contained in the property listing data is consistent with a normal itinerary of properties which would be shown to the prospective purchaser.

**Section 10.3**

LIMITATIONS ON USE OF MLS INFORMATION: Use of information from the MLS compilation of current listing information, from the MLSs "Statistical Report", or from any "sold" or "comparable" report of the MLS for public mass-media advertising by a MLS participant or in other public representations are permitted.

However, any advertisement or other forms of public representations based in whole or in part on information supplied by the MLS must clearly demonstrate the period of time over which such claims are based and must include the following Notice:

Based on information from the Michigan Multiple Listing Service, Inc. for the period (date) through (date).

## ORIENTATION

**Section 11.**

Any applicant for MLS participation and any licensee affiliated with the MLS participant who has access to and use of MLS generated information shall complete an orientation program devoted to the MLS Rules & Regulations and Policies related to MLS information entry and the operation of the MLS within ninety (90) days after access has been provided.

## STANDARDS OF CONDUCT

**Section 12.**

Any Shareholder, Affiliate or licensee affiliated with Shareholders or Affiliates are responsible to conduct their business in accordance with the NAR Code of Ethics and Standards of Practice at all times.

*Adopted:*      ***August 2002***
*Updated:*      ***August 2002***

Exhibit B

# Realcomp II Ltd.
# Policy
# Handbook

Revised: December, 2000

# DEFINITIONS

**COMPENSATION** - Compensation shall mean the fee, commission or payment (sometimes "fee" and sometimes "fee/commission") paid to a Cooperating Participant as a result of his/her involvement in the closing of a sale/lease of property listed with the MLS.

**COOPERATING PARTICIPANTS/LISTING PARTICIPANTS** - Cooperating Participants/Listing Participants are the Participants who are serviced by the MLS under an operative Subscription/Service Agreement from which they derive benefits and under which they have various obligations and duties to others and to the MLS; and out of which they seek to derive compensation from their roles in the prospective sale/lease of real estate.

**BROKER LOAD** - For the purpose of these Rules and Regulations, where there are provisions relating to the submission of documents to the Service, the document may be loaded by the office within the time constraints provided.

**FAX** - For the purpose of these Rules and Regulations, where there are provisions relating to the submission of documents to the Service, the document may be sent by facsimile within the time constraints provided.

**LISTING** - The written agreement including the Profile Form which establishes an agency relationship between a Participant as an agent and a seller/lessor of real estate (the principal) for the sale/lease of said real estate by Participant either with or without the involvement of Cooperating Participants. The agreement is sometimes known or referred to as an "agency agreement", "right to sell agreement" or "listing agreement".

**LISTING DATE** - The date that the listing is signed by the seller/lessor and accepted by the Listing Participant (by the Broker or authorized Agent).

**PARTICIPANT** - A REALTOR® eligible to receive MLS.

**PROFILE FORM** - The document which must be submitted to the MLS setting forth the information concerning the listed property. The Profile Form includes the data sheets which is a part of the Listing Agreement and such other data or certifications as may be required by the MLS from time to time. This information and data is for input into the multi list computerized database.

1

# REALCOMP II LTD
# REGIONAL MLS RULES & REGULATIONS

For interpretation of these MLS Rules & Regulations, the following shall apply:

1. Multiple Listing Service shall be referred to as the MLS provided by Realcomp II Ltd.
2. Wherever time of mailing of notice is referred to or required, postmark, fax date and time stamp or date and time of entry in the case of Broker Load shall constitute compliance.*
3. A business day for purposes of these Rules and Regulations is defined as every day of the calendar year.
4. Fineable items are indicated as (Sec.8.2).
5. Index of Symbols (Sec.5.5).

## LISTING PROCEDURES

**Section 1.0**     The Profile Form portion of listings of real or personal property within the jurisdiction of the Realcomp II Ltd Shareholder Boards/Associations shall be delivered to the MLS office or entered into the MLS computer 48 hours after all necessary signatures have been obtained. Listings containing excluded, exempt parties and buy out corporations will be accepted by the MLS and shall be clearly identified in the Exclusive Listing by the appropriate symbol (Sec. 5.5). The owner of the listed property is the client of the Listing Participant and not of all members of the MLS nor of the MLS (Sec. 8.2).*

The MLS shall accept Exclusive Listings, (which are sometimes known or identified as an Exclusive Right to Sell or an Exclusive Agency Agreement) and may accept other forms of agreement which make it possible for the Listing Participant to offer cooperation and compensation to the other Cooperating Participants of the MLS. In those instances where the seller's/lessor's written authorization is required the Listing Participant must obtain such authorization.

An Agreement with a Seller/Lessor to exclude or exempt prospects (including buy-out corporations) from full or partial commission entitlement by the Cooperating Participants shall be accepted by the MLS providing all other mandatory listing criteria are met.

Any listing taken out of any of the combined Shareholder Board/Associations' jurisdictional boundaries served by the MLS will be accepted by the MLS for dissemination.

**Section 1.1**     Any listing submitted to the MLS which is an exclusive agency must be clearly identified as an exclusive agency in a manner approved by MLS.

2

**Section 1.2**     If the seller/lessor refuses to permit the listing to be disseminated by the MLS, the Listing Participant may then take the listing as an office exclusive and such listing shall be filed with the MLS, but not disseminated to the other Participants. Filing of the Profile Form in this instance should be accompanied by the certification signed by the seller/lessor that the Listing shall not be disseminated by the MLS. (Sec. 8.2)

Any new listing submitted to the MLS that includes a "do not show until" clause must include this information in the remarks section of the profile form if applicable. In addition, written authorization from seller must be included stating "no shows until".

**Section 1.3**     All Profile Forms submitted to the MLS must be valid and shall be serviced by the Listing Participant's office.

**Section 1.4**     The approved Profile Form when filed with the MLS by the Listing Participant shall be complete and correct in every detail as specified on the keyword portion of the Profile Form. (Sec. 8.2)

**Section 1.5**     Any listing taken on a contract to be filed with the MLS is subject to the rules and regulations of the Service upon signature of the seller(s)/lessor(s). This rule also applies to listings which are sold prior to submission to the MLS."

**Section 1.6**     Listings may be withdrawn from the MLS by the Listing Participant before the expiration date of the listing provided notice is filed with the MLS including a copy of the agreement between the seller/lessor and the Listing Participant which authorizes the withdrawal. This withdrawal right shall not be used to circumvent or avoid the obligation to pay a share of the fee/commission/compensation to a Cooperating Participant.

Seller/lessor do not have the unilateral right to require an MLS to withdraw a listing without the listing participant's concurrence. However, when a seller(s)/lessor(s) can document that his exclusive relationship with the listing participant has been terminated, the MLS may remove the listing at the request of the seller/lessor.

**Section 1.7**     Any change in the Listing, including but not limited to the listed price, terms, possession, right of first refusal, or other "continue to market" contingencies shall be made only when authorized in writing by the seller/lessor and shall be filed within 48 hours with the MLS. (Sec.8.2)

**Section 1.8**     Net listings and open listings will not be accepted by the MLS.

**Section 1.9**     All listed properties which are to be sold or which may be sold separately must be identified and submitted individually on the Profile Form. When part of a listed property has been sold, proper notification shall be given to the MLS within forty-eight (48) hours. (Sec. 8.2)

Section 1.10      The MLS shall not fix, control, recommend, suggest, or maintain commission rates or fees for services to be rendered by Participants. Further, the MLS shall not fix, control, recommend, suggest, or maintain the division of commissions or fees between Cooperating Participants or between Participants and non-participant(s).

Section 1.11      Profile Forms filed with the MLS shall bear a definite expiration date.

4

Section 1.12    Any listing filed with the MLS automatically expires at midnight on the expiration date specified in the listing agreement unless renewed in writing and filed with the MLS by Participant prior to expiration date.

Section 1 13    **LISTING OF SUSPENDED PARTICIPANTS:** When a Participant is suspended from the MLS for failing to abide by his/her membership duties (i.e., violation of the Code of Ethics, Board/Association Bylaws, Realcomp II Ltd Bylaws, MLS Rules and Regulations, or other membership obligations except failure to pay appropriate dues, fees or charges), all listings currently filed with the MLS by the suspended Participant shall, at the Participant's option, be retained by the MLS until sold, withdrawn or expired and shall not be renewed or extended by the MLS beyond the termination date of the listing agreement in effect when the suspension became effective.  If a Participant has been suspended from its parent Board/Association (except where MLS participation without Board/Association membership is mandated by law or the MLS (or both)) for failure to pay appropriate dues, fees or charges, the MLS shall not be obligated to provide MLS services, including continued inclusion of the suspended Participant's listings in the MLS compilation of the current listing information.  Prior to any removal of a suspended Participant's listings from the MLS, the suspended Participant must be advised in writing of the intended suspension.  The suspended Participant shall promptly advise his/her clients affected by the suspension of such suspension.

Section 1.14    **LISTINGS OF EXPELLED PARTICIPANTS:** When a Participant is expelled from the MLS for failing to comply with membership duties (i.e., violation of the Code of Ethics, Board/Association Bylaws, Realcomp II Ltd Bylaws, MLS Rules and Regulations, or other membership obligations except failure to pay appropriate dues, fees or charges), all listings currently filed with the MLS shall, at the expelled Participant's option, be retained by the MLS until sold, withdrawn, or expired, and shall not be renewed or extended by the MLS beyond the termination date of the listing agreement in effect when the expulsion became effective.  If a Participant has been expelled from the Board/Association to which he/she belonged; (except where MLS participation without Board/Association membership is permitted by law) or MLS (or both) for failure to pay appropriate dues, fees, or charges, the MLS is not obligated to provide MLS services, including continued inclusion of the expelled Participant's listings in the MLS compilation of current listing information. Prior to any removal of an expelled Participant's listing(s) from the MLS, the expelled Participant must be advised in writing of the intended expulsion.  The expelled Participant shall promptly advise his/her clients affected by the expulsion of such expulsion.

5